## INGERMAN v. MOORE et al.*

## No. 12,733; December 16, 1890.

### 25 Pac. 275.

**Employer's Liability—Contributory Negligence.**—Plaintiff, an adult, had worked about defendant's sawmill for about four years, and for nearly a year as helper to the sawyer at an "edger," consisting of eight circular saws arranged upon a table four feet high. Under the table, six inches below the saws was a revolving shaft, with a collar upon it fastened by a projecting set-screw. Plaintiff testified that on several occasions he had run the edger himself, by direction of his employer, after telling him that he did not understand machinery; that the saws were stopped and started at will by pulling, respectively, two ropes which hung near; that the morning of the accident was quite dark, but there were no lights; that he had been directed to run the machine, and, while doing so, a sliver dropped upon the shaft which he attempted to remove, as he had seen the sawyer do, without stopping the saws, and while doing so his sleeve was caught by the set-screw, of whose existence he was ignorant, and his hand cut off. Held, that there was no evidence of negligence, and that he was guilty of contributory negligence.

APPEAL from Superior Court, City and County of San Francisco; T. K. Wilson, Judge.

Jarboe, Harrison & Goodfellow and Wm. F. Herrin for appellants; Pillsbury & Blanding for respondent.

*For subsequent opinion in bank, see 90 Cal. 410, 27 Pac. 306.

WORKS, J.—This is an action for damages for personal injuries brought by an employee against his employers. The defendants moved for a nonsuit, which was denied. There was a verdict and judgment for plaintiff for $12,500, a motion for a new trial, which was denied, and the defendants appeal. The facts are stated in the appellants' brief as follows: "In the month of January, 1884, the defendants were the owners of a sawmill at Port Discovery, Washington Territory, and the plaintiff was one of their employees, engaged in their sawmill in running an edger, or scantling machine, which was used for shaping lumber, and cutting it in various widths and thicknesses. The edger was about seven or eight feet in width, and from three to four feet in length, and had arranged upon it, at intervals upon its longest dimension, eight circular saws. These saws were moved by means of an engine, belt, and pulley, and made eight hundred and sixty revolutions a minute. The plaintiff stood in front of this machine, and, with the aid of a helper, who stood a few feet in the rear of him, ran the lumber through this edger to the rear thereof, where it was removed by others from the mill. About six feet to his rear, and close by his helper, was a rope, by pulling which, whenever it was necessary to stop the machine, the belt connected with it could be thrown off the pulley, and the movement of the saws stopped. The plaintiff commenced working at the mill in the year 1880, and from that time was continually employed there until the 14th of February, 1884. He had been at work on the inside of the mill, in connection with different saws, from the latter part of the year 1880. His special function from March, 1883, was that of an assistant to one Libben, who had charge of this edger or machine, and it was customary, when Libben was absent, for the plaintiff to take charge of the machine, with the aid of an assistant, who was detailed to help him. From the time he commenced his position as assistant to Libben, in March, 1883, he had at various times taken charge of and run the machine, at one time for several weeks in succession, and had been running it for several days prior to the accident. On the 14th of February, 1884, and for four days prior thereto, he was in charge of the machine, Libben being

sick and absent, and, with the aid of his helper, one Hansen, was running the machine himself. On the morning of that day, at about half-past 7 o'clock, a sliver had become detached from one of the planks that he was running through the saws and fell beneath the saws into an open box or frame upon which the saws were supported, and interfered with the free working of the machine. Beneath the saws, and six and a half inches below them, was a parallel shaft, revolving eighty-four times a minute, upon which this sliver rested. The floor underneath was open, for the purpose of allowing the chips and sawdust to fall through into the lower part of the mill. At the left-hand end of this parallel shaft, as you face it from the front, was a set-screw, which held a collar to it, and was placed there for the purpose of preventing its vibration. This screw projected about half an inch from the surface of the shaft, and was itself about half an inch square. When the plaintiff observed that the sliver had fallen into the box of the machine, instead of signaling his helper to stop the machine, he went around to the rear of it, while it was still moving at its usual velocity, and attempted to move the sliver with his hand. Instead of attempting to take it out with his right hand, he rested his right hand upon the frame of the box in which the machine was inclosed, and, with his left hand, reached across his body to the right-hand end of the machine, for the purpose of removing the sliver, when suddenly his hand was taken off, and his arm broken so that amputation became necessary. His hand was cut directly across at the wrist without any scratch or mutilation of any character, and, with some scraps of his clothing, fell down into the chute below the machine, where it was several hours afterward found.''

The plaintiff testified with reference to his employment in running the machine and the way in which the accident occurred, as follows: ''I am twenty-nine years old. I commenced to work at the mill of the defendants on the 24th of May, 1880. The mill was then owned by Mr. Mastick. The defendants took charge of it in 1881 or 1882. When I first went there I worked on the lumber pile. Then I commenced to work on the rollers inside, taking the lumber from the big saw. I did this kind of work about two

years and a half.   Then I went to work with John Libben on this scantling machine, where I got hurt.   I had been at work on that machine about nine months before I was hurt. This machine was about seven or eight feet wide, and three or four feet long.   Question.   How was that machine worked?   What kind of power?   Answer.   Steam power. Q.   By a belt?   A.   Yes, sir; by a belt.   Q.   With a brake or wheel?   A.   We had a rope to pull.   Six feet away from me was a rope to pull, and generally the man who was helping had to pull that rope when they wanted to stop the machine.   Q.   What did you do when you started it?   A. Well, there were two ropes, one to start, and one to stop. Q.   So you pulled one to start, and one to stop?   A.   Yes, sir.   Q.   Did you ever run that machine?   A.   Yes, sir, I did.   Q.   When was the first time you ran it, about as near as you can recollect?   I will ask you first how many times do you remember running it before the time you got hurt? A.   I ran it three times.   Q.   As near as you can remember, tell me the first time you ran it.   A.   The first time I ran it about four days.   Q.   How long before you got hurt, as near as you can tell?   A.   About five months before I was hurt. .  Q.   How long did you run it that time?   A.   About four days.   Q.   How did you come to run it at that time? A.   Mr. Libben was sick and absent.   Q.   I want to get at who, if anybody, asked you to run it, or directed you to. A.   Well, Mr. McCann told me to go there.   Q.   Tell the jury how, just exactly how, it happened.   A.   Mr. McCann told me to go and run the machine; that is all.   I did not know much about machinery.   He thought I could do it.   I said: 'I will do my best.'   He said: 'Go ahead; I think you can run it.'   Q.   What else, if anything, was said?   A. Nothing more said at that time.   He told me to go there, and I had to go there.   Q.   Did he give you any further instructions or directions?   A.   No.   He gave me no instructions whatever.   Q.   How long did you say you ran it at that time?   A.   I ran it about four days.   Q.   How soon was that after the first time?   A.   About a month or six weeks after.   Q.   You say you ran it two days.   How did you come to run it then?   A.   Well, Mr. McCann came and told me to run it.   Q.   What was said?   Tell the jury all that was said about it.   A.   Well, I always told Mr.

McCann I was no machinist, and didn't know much about machinery, so he had to take somebody else, and he always told me he thought I was able to run it, and I had to go there. Q. I am getting at the second time. You have told about the first time. Now, I want to get at the other, as near as you can remember. A. Well, that is as near as I can remember. I always told Mr. McCann I did not know much about machinery. Q. Well, then, you went for about two days, you say? A. Yes, sir. Q. Then, when did you run it again before you were hurt, if you did? A. I think I ran it some time in November. What time, I could not exactly say. Q. In November, before you were hurt? A. Yes, sir. Q. How long did you run it then? A. About nine days. Q. Where was Libben at that time? A. He was sick. . . . . Q. Now, tell the jury what you were doing when you got hurt. A. I was trying to take the sliver out of the machine, and my hand got caught by the set-screw, and tore off. Q. Where was this sliver? A. Right underneath the machine—right underneath the saw. It prevented me. I could not lift the rollers up to put the lumber into the machine. Q. How did you come to pull the sliver out, or be pulling the sliver out? A. I could not lift the rollers, so I had to get behind the machine, and try to get the sliver out; and it was a dark morning, the lights were out, so I tried to get the sliver out, and got my hand in the machine, and caught in the set-screw. I could not see the set-screw. I didn't know the set-screw was there. Q. What did the set-screw catch on, if anything? A. It caught my jumper, my outside shirt. Q. One of those strong jackets you wear outside to keep off the dust, was it? A. Yes, sir, and that catched inside, and pulled my arm around the shaft, and tore my hand off and broke my arm, and then I got out again. Q. Had you ever pulled a sliver out of there before? A. Not in that place, a good many other places. I done just exactly as I saw Mr. Libben do. I saw him pull slivers out of the same place.''

It is contended by the appellants that the nonsuit should have been granted for two reasons, viz., that the evidence failed to show negligence on the part of the defendants, and that it did show contributory negligence on the part of the plaintiff. We feel constrained by the evidence, as

it appears in the transcript, to agree with the appellants in this contention. We think the evidence fails to show negligence on the part of the appellants; but if there is any question as to this, there can be none as to the contributory negligence of the respondent. By counsel for respondent much stress is laid upon the fact that he was not regularly employed to run the machine which caused the injury, and was not competent to run and manage it; but his own testimony shows that he had been a helper on the machine for several months, and had himself run it a number of times for several days on each occasion. Besides, the accident did not occur, in this instance, because of any mismanagement of the machine, but was the result solely of carelessness on the part of the plaintiff in attempting to remove the sliver from the machine by placing his hand in close and dangerous proximity to the running saws. It was wholly unnecessary for him to run this risk. He testifies that his machine could be stopped by pulling a rope, and started by pulling another. He was a man of mature years, and was bound to know the risk and danger of taking the course he did, and as it was unnecessary for him to do so he was guilty of negligence which must prevent a recovery in this case.

It is contended that there was negligence on the part of the appellants in not having the room in which the machine was operated sufficiently lighted, but, if this be conceded, the act of the respondent in putting his hand near the saws in the dark only proves his negligence more clearly. Again, it is contended that there was negligence on the part of the defendants in having a set-screw on the shaft connected with or near the machine. But it appears from the evidence that the set-screw was necessary for the proper running of the machinery, or a part of it, and, besides, the accident, which it is claimed occurred on account of the set-screw being there, could not have occurred but for the negligent act of the plaintiff above mentioned. For these reasons the court below erred in overruling the motion for a nonsuit, and in denying the defendants a new trial. Judgment and order reversed and cause remanded.

We concur: Fox, J.; Sharpstein, J.; Thornton, J.

I dissent: McFarland, J.

BEATTY, C. J.—I dissent. There was, in my opinion, sufficient evidence of negligence on the part of defendants to go to the jury, and not sufficient evidence of contributory negligence on the part of the plaintiff to justify the court in granting a nonsuit on that ground. It is clear that the machine was dangerous to a man unfamiliar with its construction, and ignorant of the proper method of keeping it in order. If the plaintiff had expressly represented himself as competent to run and manage it, or had impliedly done so by seeking the employment, there might have been no duty resting upon the defendants to instruct or warn him as to the dangers involved in its operation. But the plaintiff's evidence showed that. so far from seeking the employment, or leading the defendants by any express or implied representations to suppose that he was competent to operate the machine, he accepted the employment unwillingly, protesting that he did not understand machinery, and that some one else should be put in charge. When a man is set to work upon a dangerous machine, under such circumstances, I think the employer is guilty of negligence if he fails to give proper instructions as to the method of operating the machine safely, and he is more specially guilty of negligence if he instructs the employee to operate it in a manner that is dangerous. Now, in this case, the only instruction ever given to the plaintiff, according to his evidence, was to do as he had seen Libben do, and in following this instruction he incurred the injury complained of. In this view of the case, a nonsuit would certainly have been improper, and the verdict of the jury is sustained by the evidence.